**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JENNIFER MCELLIGOTT,

          Plaintiff,

THE CITY OF NEW YORK, POLICE OFFICER
EUGENE DONNELLY, SERGEANT
FRANKLIN BOHR, POLICE OFFICER
NICHOLAS LEVESQUE, POLICE OFFICER
GENE RYERSON, POLICE OFFICER RYAN
BRACCONERI, POLICE OFFICER BRITTANY
MCGEE, and POLICE OFFICER WILLIAM
CURLY

          Defendants.

15-CV-7107 (LGS)(DCF)

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

By and through her attorneys, Randolph M. McLaughlin, Debra S. Cohen, and Danielle B. Sullivan of Newman Ferrara LLP, Plaintiff Jennifer McElligott alleges, upon knowledge, information, and/or belief as follows:

**PRELIMINARY STATEMENT**

1.  This is a civil rights action in which Plaintiff Jennifer McElligot ("McElligott" or "Plaintiff") seeks relief for the Defendants' violations of the Plaintiff's rights, privileges, and immunities secured by 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments of the United States Constitution, and the Constitution and laws of the State of New York.

2.  It is alleged that, on June 10, 2014, the Defendant Police Officer Eugene Donnelly ("Donnelly"), was awarded the Police Combat Cross by Mayor Bill De Blasio.

3.  After the ceremony he returned to work at the 46th precinct and then left with his supervisor and another officer to begin a night of celebration.

4.  The celebration involved a night of heavy drinking over the course of many hours,

1

in three different bars, with several fellow New York City Police Officers, including, but not limited to, Defendant Donnelly's direct supervisor.

5.      The large amount of alcohol consumed was sufficient to render Defendant Donnelly, his supervisor, and fellow officers unfit for duty, in violation of the New York City Police Department's Patrol Guide.

6.      The New York City Patrol Guide also requires that an officer, who becomes aware that a fellow officer is unfit for duty due to excessive alcohol consumption, has an affirmative duty to report such officer to his/her superiors.

7.      None of the officers reported that Defendant Donnelly was unfit for duty due to his excessive consumption of alcohol.

8.      After the "celebration" concluded, Defendant Donnelly spent the night at the apartment of one of the officers with whom he had engaged in excessive alcohol consumption.

9.      The apartment was located on the same floor as Plaintiff's apartment.

10.     In the early morning hours of June 11, 2014, Defendant Donnelly awoke, left his friend and colleagues apartment, forcibly kicked opened Plaintiff's door, restrained her using excessive force and questioned her as to whether she had a firearm.

11.     Plaintiff managed to escape from the apartment, but not before Defendant Donnelly's actions, in conjunction with those of the other Defendants, caused significant physical, emotional and psychological injuries and economic loss to Plaintiff and deprived her of rights secured by the United States Constitution, federal law, and the Constitution and laws of the State of New York.

12.     The Defendant Police Officers and Supervisor knew, or should have known, that Defendant Donnelly had consumed excessive amounts of alcohol and thereby rendered himself,

thereby, unfit for duty.

13.     Said Defendant Officers knew or should have known that they had a duty to report Defendant Donnelly's condition to his superiors and that choosing not to report him would create or increase the danger of injury to innocent people he would encounter in that condition, including Plaintiff.

14.     It is also alleged that as a result of a shooting incident, prior to the assault on Plaintiff, wherein Defendant Donnelly was fired upon by a suspect and discharged his service weapon, Defendant Donnelly sustained a trauma that resulted in Post-Traumatic Stress Disorder ("PTSD") that over several months, prior to his attack on Plaintiff, increasingly manifested itself in Defendant Donnelly's excessive consumption of alcohol, night terrors, sleep disorders, and other mental health issues.

15.     Despite evidence and knowledge of Defendant Donnelly's changed behaviors, his supervisors and co-workers failed to report Defendant Donnelly to the New York City Police Department ("NYPD") due to a culture of silence within the NYPD arising from an institutionalized stigma regarding police officers suffering from work related mental health disabilities.

16.     The culture of silence arising from this stigma was known or should have been known to the NYPD and the City of New York ("City"). Despite the fact that officers placed in stress inducing situations often engage in alcohol abuse, self-medication, violent behaviors and other stress related or PTSD symptoms, little was done by the NYPD to monitor officers that have experienced stressors on or off the job that could negatively impact their on and off-duty behavior that could lead to the type of injuries Plaintiff sustained.

17.     It is further alleged that the failure of the Defendant City and the NYPD to adopt

3

and/or enforce adequate policies, procedures, and practices to address PTSD or other psychological traumas that its officers experience, or alcohol and substance abuse by its police officers, while both on-duty and off-duty, constituted deliberate indifference and was a proximate cause of Plaintiff's injuries.

18.     Said failure of the Defendant City of New York is a result of a policy or practice of deliberate indifference to the mental trauma experienced by the City's officers which often results in the use and abuse of alcohol and other destructive and dangerous behaviors by its police officers.

19.     Furthermore, the policy or practice of deliberate indifference is evidenced by the failure of the City to adequately screen police candidates for prior incidents of alcohol abuse, to monitor their sobriety after being hired, and/or, as in this situation, to provide its officers who have had such a history with adequate and effective mental health monitoring and support services after the officer has been exposed to trauma associated with being a police officer.

20.     It is alleged that Defendant Donnelly had a history of alcohol abuse and disorderly conduct, that this history was known to the City prior to his hire, that the City failed to monitor Defendant Donnelly to ensure that he did not resume abusing alcohol to cope with the stress of policing, and provide him the mental health services he required to cope with the trauma he experienced during and after the May 4, 2012 incident.

21.     The other Defendant Police Officers and Defendant Supervisor knew or should have known that Defendant Donnelly was exhibiting symptoms that provided notice that he required mental health monitoring and assistance.

22.     Said failures of the City, amounting to deliberate indifference to known risks, and the condonation, and encouragement of his fellow officers, defendants herein, to engage in

4

excessive consumption of alcohol was a direct and proximate cause of the injuries Plaintiff sustained on the night in question.

23.     As a remedy for these violations alleged herein, Plaintiff seeks compensatory damages, punitive damages, and an award of the costs and expenses of this action including attorneys' fees to the Plaintiff pursuant to 42 U.S.C. §1988; and any such other and further relief as this Court may deem appropriate.

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and §1343. Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367 to hear and decide claims arising under state law.

25.     Venue in the Southern District of New York is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this action occurred within the district.

## TRIAL BY JURY

26.     Plaintiff demands trial by jury on each and every one of her claims herein.

## PARTIES

27.     At all times relevant, Plaintiff Jennifer McElligott was a resident of Bronx County, New York.

28.     Defendant City is a duly constituted municipal corporation of the State of New York. It is authorized under the laws of the State of New York to maintain a police department, the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

5

29.     Defendant Donnelly was at all times relevant herein a police officer employed by the City and the NYPD. At all times relevant to the facts of the Amended Complaint, said Defendant was acting under color of law and within the scope of his employment. Said Defendant is sued in his individual and official capacities.

30.     Defendant Sergeant Franklin Bohr ("Bohr") was at all times relevant herein a police sergeant employed by the City and the NYPD. At all times relevant to the facts of the Amended Complaint, said Defendant was Defendant Donnelly's supervisor, was acting under color of law and within the scope of his employment. Said Defendant is sued in his individual and official capacities.

31.     Defendant Officer Nicholas Levesque ("Levesque") was at all times relevant herein a police officer employed by the City and the NYPD. At all times relevant to the facts of the Amended Complaint, said Defendant was acting under color of law and within the scope of his employment. Said Defendant is sued in his individual and official capacities.

32.     Defendant Officer Gene Ryerson ("Ryerson") was at all times relevant herein a police detective employed by the City and the NYPD. At all times relevant to the facts of the Amended Complaint, said Defendant was acting under color of law and within the scope of his employment. Said Defendant is sued in his individual and official capacities.

33.     Defendant Officer Ryan Bracconeri ("Bracconeri") was at all times relevant herein a police officer employed by the City and the NYPD. At all times relevant to the facts of the Amended Complaint, said Defendant was acting under color of law and within the scope of his employment. Said Defendant is sued in his individual and official capacities.

34.     Defendant Officer Brittany McGee ("McGee") was at all times relevant herein a police detective employed by the City and the NYPD. At all times relevant to the facts of the

Amended Complaint, said Defendant was acting under color of law and within the scope of her employment. Said Defendant is sued in her individual and official capacities.

35.     Defendant Officer William Curly ("Curly") was at all times relevant herein a police detective employed by the City and the NYPD. At all times relevant to the facts of the Amended Complaint, said Defendant was acting under color of law and within the scope of his employment. Said Defendant is sued in his individual and official capacities.

36.     The conduct and injuries complained herein were inflicted on the Plaintiff by the Defendants without any negligent or culpable conduct by the Plaintiff.

## FACTUAL ALLEGATIONS

### Defendant Donnelly's History of Alcohol Abuse

37.     Defendant Donnelly began abusing alcohol during his senior year in high school. He would binge drink on weekends approximately once a month during school and on a weekly basis during the summer before college.

38.     During his freshman year at Methodist College in North Carolina, Defendant Donnelly continued to consume excessive amounts of alcohol. During these binge drinking episodes, Defendant Donnelly would consume, in a short interval, six to fifteen beers at a time.

39.     As a result of his excessive drinking, Defendant Donnelly had behavioral problems while at Methodist College. He was involved in a fighting incident, and received citations for public urination and open container violations.

40.     After his first year at Methodist, Defendant Donnelly then transferred to the College of Charleston ("Charleston") where he was involved in a number of alcohol related incidents over a two-year period, including, but not limited to, throwing an ashtray through a window, threatening behavior, vandalism, disorderly conduct, recklessness, and an open

7

container violation.

41.     On January 11, 2006, Defendant Donnelly was charged with vandalism by Charleston. On February 22, 2007, Defendant Donnelly was charged by the college with making threats and was banned from entering a residential campus building. He was referred to a walk in clinic for counseling.

42.     On April 30, 2007, Defendant Donnelly was charged with the failure to complete sanctions, banned from entering the residence hall, and banned from entering all the halls and houses. He was mandated to attend an off-campus treatment/campus program, which he completed on August 9, 2007.

43.     On November 16, 2007, Defendant Donnelly received a Sanction Notice subsequent to a November 16, 2007 incident in which the school charged him with disorderly conduct. He was arrested and charged with disorderly conduct. He was banned from campus until the end of Spring 2009, unless and until he completed an anger management-counseling program.

44.     As a result of these aforementioned incidents, Defendant Donnelly was suspended for three semesters for honor code violations. Charleston has a three strike policy regarding alcohol abuse.

45.     After failing to return to the College of Charleston, Defendant Donnelly attended Alcoholics Anonymous meetings and remained abstinent from alcohol for a period of four years.

### Defendant Donnelly's Employment by the NYPD

46.     Defendant Donnelly entered the NYPD academy in July of 2010.

47.     During the hiring process, Defendant Donnelly disclosed his prior history of alcohol abuse and disciplinary and legal issues arising from his behavior in college.

48.     Prior to hiring Defendant Donnelly, despite being on notice of his history of alcohol abuse, that had led to incidents of violence and disorderly conduct, the NYPD failed to adequately investigate his background and screen his psychological suitability to be a police officer during the application process.

49.     After hiring Defendant Donnelly, the NYPD failed to monitor his psychological health to determine whether he was coping with the stress and/or trauma of policing without a relapse of abusing alcohol or other stress and trauma induced dangerous or destructive behaviors.

50.     During his tenure as a police officer, the NYPD failed to adequately train and supervise Officer Donnelly, and his fellow police officers (some of whom are defendants in this action), regarding the symptoms of PTSD and/or stress that arise from police work and the importance of seeking help when the symptoms arise.

51.     The NYPD failed to implement training, policies and procedures to remove the deeply embedded and well known stigma within the NYPD associated with mental health issues perceived by its police officers and the belief that seeking assistance to resolve these issues would jeopardize their careers.

52.     In January 2011, Defendant Donnelly was assigned to the 46th precinct, a precinct known to be one of the busiest and most dangerous precincts in the City.

53.     He requested this assignment.

54.     Defendant Donnelly's first assignment was in a rookie police officer unit, Operation Impact, where young police officers are placed in high crime areas to conduct arrests and issue summonses. Upon information and belief, the Operation Impact unit no longer exists.

55.     Defendant Donnelly ambitiously dove into his work; making 5-15 arrests a night. He worked in a high crime area and saw people hurt, shot and maimed. There were car chases,

gun arrests and domestic disputes.

56.     At all times relevant to the Amended Complaint, Defendant Bohr was Defendant Donnelly's immediate supervisor at the 46th Precinct.

57.     On May 4, 2012, Defendants Donnelly and Bracconeri (who were partners at the time), while off-duty, witnessed a man brandishing a pistol, chasing others down the street. They followed the suspect in their cars, eventually apprehending him.

58.     During the incident, the man turned and fired at Defendant Donnelly who returned fire from his car, striking the man several times.

59.     Defendants Donnelly and Bracconeri received praise for their bravery during the incident.

60.     Two years later, on June 10, 2014, Defendant Donnelly was awarded the Combat Cross for his actions on May 4, 2012, the NYPD's second highest honor, at the NYPD's Medal Day ceremony.

61.     Despite the praise he received from the NYPD, and the shooting being deemed justified, Defendant Donnelly spent the 13 months following the May 4, 2014 incident working in a warehouse copying summonses.

62.     During this time he had very little working contact with fellow police officers or supervisors.

63.     It was during this period that he resumed drinking alcohol and began to experience other severe trauma related symptoms, including night terrors, insomnia, and sleep walking.

64.     The longer he was isolated and inactive in his assignment copying summonses the more his symptoms worsened.

65.     During this period immediately following the May 4, 2012 incident, no one from the NYPD supervised or monitored Defendant Donnelly for possible trauma related mental health issues, including but not limited to PTSD and alcohol abuse.

66.     A day or two after the May 4, 2012 incident, Defendant Donnelly was ordered to report to an NYPD psychologist with whom he had a brief meeting lasting approximately 30 minutes.

67.     The psychologist did not provide any information about PTSD nor give Defendant Donnelly any instructions as to what to do should certain trauma related symptoms arise.

68.     There was no follow-up with Defendant Donnelly by the psychologist after this initial meeting to check on his condition.

69.     Defendant Donnelly had no communications with anyone in the NYPD regarding the importance of reporting any such symptoms nor was he given any reassurances to combat the known stigma within the NYPD associated with seeking psychological services.

70.     Defendant Donnelly also met with a peer counseling group shortly after the May 4, 2012, incident who offered him only vague direction as to services available to him.

71.     As with the psychologist, the peer group meetings occurred shortly after the May 4, 2012 incident, which was before he began experiencing the PTSD related symptoms he has been diagnosed with and treated for after receiving in patient treatment following the June 11, 2014 incident underlying this action.

72.     Defendant Donnelly was not assessed by NYPD mental health professionals as to whether he was fit to return to active duty. He was not assessed with respect to whether he had or could potentially resume his alcohol dependency. Furthermore, no discussion was had in regard

to the potential consequences such a traumatic event could have on an individual, nor was Defendant Donnelly informed of potential symptoms of PTSD that could develop in the following weeks or months.

73.    Defendant Donnelly was highly praised for his heroic act, but his assignment to desk duty led him to believe that he was being punished, which caused him additional stress.

74.    As a result of the incident, coupled with the stress, frustration and isolation of his re-assignment, he resumed abusing alcohol.

75.    It was at the wedding of a fellow police officer Defendant Donnelly resumed consuming alcohol in the presence of other officers, including Defendant Bracconeri, who knew that he previously had abstained from alcohol.

76.    Defendant Bracconeri was also aware that Defendant Donnelly was experiencing sleep terrors and sleepwalking.

77.    Defendant Donnelly consumed alcohol to cope with his mental health issues, to be social and to help him sleep.

78.    Defendant Donnelly's sleep issues, included, but were not limited to, insomnia, night terrors, waking up gasping or screaming, and sleepwalking.

79.    During his sleep incidents, Defendant Donnelly would sometimes reenact his police officer functions and engage in aggressive behaviors. During one episode, he took off the screens in his windows. On another occasion he threw a laptop across the room. He would wake up in his usually neat and tidy room to find it in disarray: his bed would be flipped, laundry thrown around.

80.    Other sleep incidents involved night terrors where Defendant Donnelly feared for his safety, expressing thoughts of being killed and/or followed, and other reenactments of

Defendant Donnelly's police officer duties.

81.     Defendant Donnelly took it upon himself to disassemble his gun before he went to sleep, for safety reasons.

82.     His sleeping issues were witnessed by a number of his friends, including, but not limited to, Defendant Bracconeri.

83.     Despite the clear indications that Defendant Donnelly was engaging in negative behaviors, including, but not limited, to excessive consumption of alcohol and sleep disorders, the officers who witnessed these behaviors, including, but not limited to, Defendants Bohr and Bracconeri, failed to report that Defendant Donnelly may have become unfit for active duty.

84.     Following 13 months of desk duty, Defendant Donnelly was assigned to work in the Bronx Auto Larceny Unit for nine months.

85.     In March 2014, despite that fact that Defendant Donnelly had not been provided with any psychiatric services or assessments as to whether he was fit to return to duty, he was reassigned to the 46th precinct as a field intelligence officer ("FIO"), back under the supervision of Defendant Bohr. He worked in this position for approximately ten weeks when the incident occurred with Plaintiff.

86.     During the ten-week period, Defendant Donnelly aggressively jumped back into his work. He conducted numerous arrests and worked an extreme amount of hours. He often worked for days without sleeping. His work records demonstrate that he was working excessively and failing to submit requests for overtime pay for many of the hours that he worked overtime.

87.     Frequently, Defendant Donnelly would forget to clock out and would spend numerous nights sleeping on a couch in his office at the precinct.

88.     Often times Defendant Donnelly following his shift, would go out with the anti-crime unit, a unit that Defendant Bracconeri, PO Brendan Cronin and Sergeant Edwin Ching were a part of. (*See* ¶ 100(o) regarding the involvement of Defendant Bracconeri, PO Cronin and Sgt. Ching in an off-duty incident involving alcohol which resulted in attempted murder charges against Cronin, and discipline for Ching and Defendant Bracconeri for drinking while on-duty).

89.     Due to Defendant Donnelly's sleeping issues, he went many days without adequate sleep.

90.     In the NYPD, functioning with little sleep was applauded.

91.     Defendant Donnelly's supervisors, including Defendant Bohr, were aware of the long hours he was putting in, including his nights spent sleeping at the precinct, and failed to act upon Defendant Donnelly's self-destructive behaviors that could be a danger to himself and others.

92.     Despite their knowledge that Defendant Donnelly was experiencing undue stress and was engaging in self-medicating and avoidance behaviors, Defendants Bohr, Bracconeri, and others, failed to report that Defendant Donnelly was engaging in these behaviors.

### The City's Longstanding Deliberate Indifference to PTSD Issues, Alcohol and Substance Abuse by Its Police Officers

93.     For at least two decades there has been an accepted culture in the NYPD and a failure, constituting deliberate indifference, to adopt and/or enforce adequate policies, procedures and practices to address a longstanding problem of mental health issues experienced by police officers, which often resulted in alcohol and substance abuse by police officers, both on-duty and off-duty.

94.     The City's and NYPD's deficiency in adequately responding to these issues includes a failure to adopt and/or enforce policies addressing the violence visited upon innocent

14

civilians by both on and off-duty officers, who are not fit for duty because of mental health issues.

95.     This incident of a drunken New York City police officer engaging in an act of violence against an innocent civilian highlights an open secret within the police force—the NYPD has a longstanding alcohol and substance abuse problem, resulting from PTSD and other psychological trauma, and the City has failed to effectively address it.

96.     The City's longstanding deliberate indifference is demonstrated by the failure to take necessary steps to deal with the problem despite Commissioner Bratton vowing in 1995, during his first tenure as New York City Police Commissioner, to address it with a "new strategy on police corruption."

97.     Also in 1995, former Mayor Rudolph Giuliani created the Commission to Combat Police Corruption ("Commission"), which produced a report in 1998 reviewing cases of on-duty and off-duty misconduct fueled by the misuse of alcohol. The Commission then made recommendations to address the problem but the City and NYPD never took the necessary steps to effectively implement them.

98.     Defendant Donnelly's alcohol-fueled misconduct was not an isolated incident as evinced by the number of other incidents, in addition to this incident, involving intoxicated NYPD officers in 2014 alone.

99.     There have been countless alcohol related arrests involving police officers over the years and a litany of violent acts by police officers misusing force.

100.     In addition to this incident, there are numerous other examples of alcohol abuse and acts of violence by NYPD officers, and the harms that result. Examples include, but are not limited to:

a.  On April 23, 2017, Neville Smith, an NYPD police officer, was driving drunk on the Van Wyck Expressway when he struck a car from behind. The car, which was carrying three people, struck a pole and a tree. The driver and the two passengers were taken to the hospital where the driver later died. Smith was charged with criminally negligent homicide, vehicular manslaughter and drunken driving.

b.  On March 16, 2017, an off-duty NYPD traffic enforcement agent, Stafan Hoyte, 26, was involved in a one-car crash on the Manhattan side of the Williamsburg Bridge. Amanda Miner, 21, a passenger in the back seat was ejected from the vehicle and killed. Hoyt was charged with driving while intoxicated, vehicular manslaughter and criminally negligent homicide. The front seat passenger, Michael Camacho, 24, was also an off-duty traffic cop.

c.  On February 1, 2017, Bianca Bennett, an off-duty cop was killed in a speeding car driven by off-duty Sgt. Randolph Price, on their way home after a late dinner with friends at a City Island Restaurant.

d.  On January 17, 2017, Police Officer Yong Yun, 31, shot himself in the neck— taking his own life. Sources stated that Yun had a gambling and drinking problem, but was recently denied a transfer out of the 120th Precinct. Neighbors believe Yun was seen heavily intoxicated about three hours before his death.

e.  On January 12, 2017, Police Officer Richard Evans, 44, faced charges of driving while intoxicated and official misconduct for driving a police cruiser while he was drunk driving during his overnight shift. A supervising sergeant allowed Evans— who was still drunk—to drive the patrol car back to the precinct after he responded to a call.

f.  On January 2, 2017, an off-duty New Rochelle Police Officer, and recent police academy graduate Harry Kyreakedes, 27, was arrested on charges that he was well over the legal blood-alcohol limit when he crashed into a tree and killed his passenger.

g.  On November 13, 2016, Police Officer Donald Vale pulled his gun on a woman who cut him off on Long Island.  Vale chased after her in a rage and threatened her with a gun. He was charged with menacing, and the NYPD ordered his suspension, pending the outcome of his case.  Vale is a member of the NYPD's Character Assessment Section, responsible for vetting recruits coming into the department.

h.  On September 27, 2016, Suffolk County Police Officer Robert Scheurer, 24, drove the wrong way on a Suffolk County highway, with a blood alcohol level of .17. He smashed into a van and killing the van's driver, and was charged with aggravated vehicular homicide, manslaughter, drunken driving and reckless endangerment.

i.  On July 27, 2016, an off-duty NYPD officer, Jamill Wade, 31, and his 29-year-old girlfriend, were both arrested for punching and kicking one another in Queens. Both were charged with assault.

j.  On July 16, 2016, off-duty NYPD officer Nicholas Batka slammed his gray Durango onto the sidewalk of a residential area in Brooklyn, killing one man and putting a woman in critical condition from life-threatening injuries.

k.  On July 6, 2016, NYPD Sergeant Sergio Gonzalez, 36, was arrested for strangling his police officer girlfriend, Lisa Munoz, after an argument over his other child's mother. Gonzalez was charged with strangulation, criminal mischief, harassment and endangering the welfare of a child.

l.  In April 2016, at a bar in Massapequa Park, the son of an FDNY battalion chief was beat down while an off-duty NYPD cop, Frank Colavito, looked on. Surveillance video showed the off-duty cop appearing to laugh after watching the crime, and he never reported it or did anything to help. The victim claims that before the attack, Colavito got into his face, opened his jacket and showed him his badge, saying "I'm with the NYPD and you're not going anywhere." Colavito was fired from the NYPD in June 2017.

m.  On March 15, 2015, Queens Police Officer Clinton Wike was pulled off a plane leaving Toronto and bound for New York, when he was accused of public intoxication. Toronto Constable testified that Wike had his shield out, showing it to everyone, and that Wike was jokingly telling others that he had been taken off the plane because he had 20 kilos of coke in his bag.

n.  On August 12, 2014, NYPD Police Officer Richard E. Christopher, 32, with a reported blood-alcohol content of 0.21, drove the wrong way on the New York State Thruway near Suffern, crashing his car head-on into a car driven by the sole passenger. Both men were killed in the crash.

o.  On April 29, 2014, NYPD Officer Brendan Cronin emptied his service weapon into a car in Pelham, New York, striking the passenger 6 times, nearly killing him. Officer Cronin had finished a training session at Rodman's Neck where he was trained regarding high risk car stops. Following the training session, he drank alcohol during lunch and after the training was over with his supervisor, Sgt. Edwin Ching, two trainers, and fellow officer, Defendant Ryan Bracconerri.

p.  On April 29, 2014, outside a strip club in Somerset County, New Jersey, NYPD Sergeant Wanda Anthony, assigned to the 122nd Precinct in Staten Island, fired at least one round at a former boyfriend. Anthony, who fled in a car, was intoxicated at the time of the shooting.

q.  On April 23, 2014, NYPD Detective Jay Poggi got drunk and accidently shot his partner in the wrist with a .38 revolver. Instead of calling an ambulance, Poggi

decided to personally drive his wounded partner to the hospital—resulting in a DWI after he blew a .113 on a blood alcohol test. Investigators believe the shooting occurred when the on-duty officers, who had just consumed 11 beers apiece, were firing the gun in the air.

r. On April 7, 2014, NYPD Police Officer Shieed Haniff was charged with four counts related to an incident in which he allegedly crashed into multiple cars and nearly plowed down his fellow police officers while driving drunk.

s. In January 2014, a NYPD Police Captain found ten beers in the Forty-Seventh Precinct.

t. On October 6, 2013, drunken off-duty NYPD Police Officer Joseph McClean was arrested and charged after hitting a pedestrian in Staten Island. The pedestrian was killed and the officer was charged with manslaughter.

u. In July 2013, an NYPD SVU officer Lukasz Skorzewski traveled with a Lieutenant to Seattle to investigate a woman's claims she was raped in an apartment in New York City. Following the interview of the woman, the two cops took her out on a 10-hour pub-crawl. The next morning the officer groped the woman when he attempted to take her clothes off. The two policemen plead guilty to departmental charges of prohibited conduct.

v. On September 25, 2012, NYPD Det. Edwin Mateo, after experiencing traumatic events while serving in the military, was involved in a lethal shooting of an emotionally disturbed man, Mohamed Bah, in his home. On information and belief, Mateo, who discharged his weapon at Mr. Bah, shot the final of seven shots, into Mr. Bah's head, at close range.

w. In December 2011, NYPD Police Officer Rafael Casiano, 44, was driving on a Bronx expressway at about 4:30 a.m. Friday when his car smashed into a center divider. The passenger was another off-duty NYPD Police Officer, Keith Paul, who suffered a head wound and had to be hospitalized. They were coming home from their Manhattan precinct Christmas Party.

x. In October 2009, NYPD Detective Kevin Spellman was sentenced to three to nine years in prison for the drunk-driving death of a Bronx grandmother.

y. In September 2009, off-duty NYPD Police Officer Andrew Kelly struck and killed a woman with his car in Brooklyn. Kelly pleaded guilty to driving drunk, served 90 days in jail and went to rehabilitation.

z. In 2001, an off-duty NYPD Police Officer who spent up to 12 hours drinking before going to his Brooklyn precinct struck and killed a 24-year-old pregnant woman, her 4-year-old son, and her 16-year-old sister. Medical staff delivered the woman's baby boy, who died 13 hours later, and NYPD Police Officer Joseph

Gray was eventually convicted of four counts of second-degree manslaughter. He was sentenced to 5 to 15 years in prison. The event "mushroomed into scandal" when it was discovered that other officers were drinking with Gray in a topless bar at a nearby precinct parking lot before the incident.

aa. On May 18-20, 1995, NYPD Police Officers, staying at the Hyatt Regency Hotel in Washington, D.C., disrobed, poured beer down the lobby escalator and then slid down it. Some sprayed fire extinguishers at each other and at other guests, set off false alarms and vandalized the hotel. Other reports involve armed officers in uniform drinking heavily and firearms being discharged from a hotel. Officers also allegedly tried to gain entry to women's rooms by posing as Federal agents and harassed female guests.

101. On information and belief, many of these incidents are the result of the mental stress that police officers experience and the failure of the NYPD to address the mental health challenges these individuals experience in the performance of a stressful and physically demanding job.

102. Defendant City, as a matter of policy and practice, has with purposeful disregard, failed to adequately discipline, train, monitor, supervise, treat or otherwise direct police officers, including the Defendant Police Officers, with regard to the consumption of alcohol on-duty and off-duty.

103. Defendant City has also failed to adequately create and/or enforce policies and procedures that address NYPD employees' substance abuse, including alcohol consumption. This failure has led to Defendant Donnelly's actions.

104. Defendant New York City, as a matter of policy and practice, has failed to properly investigate the background, beliefs, and attitudes of prospective police officers in order to ensure it hires only police officers that respect and honor the constitutional rights of individuals, thereby causing the NYPD, including its Defendants in this case, to engage in the unlawful conduct described above.

105. Defendant City, as a matter of policy and practice, has failed to properly screen

police applicants for a history of, or propensity for, substance abuse, including alcohol.

106.    Defendant City fails to assess and monitor police officers after such officers have been involved in shooting incidents, or otherwise stressful assignments.

107.    Defendant City has a policy of purposeful disregard to the mental health issues that its officers experience due to the often violent nature of police work in high crime areas.

108.    Defendant City's failure to adopt and implement policies to address the mental health challenges experienced by its officers results in self-medication by its officers, including, but not limited to, excessive consumption of alcohol.

109.    Said Defendant has also failed to train its police officers on stress management, PTSD, and to adopt an adequate early warning system that would signal when an officer was not mentally fit for duty.

110.    Defendant City failed to train its police officers on how to identify warning signs in fellow officers who may be suffering from mental health problems.

111.    Defendant City has also failed to require its police officers to report fellow officers who they may suspect and/or know are experiencing psychological problems, including but not limited to, PTSD.

112.    Defendant City's failures aforementioned also increases the danger to the residents of the City that officers, with undiagnosed or treated PTSD symptoms, will engage in self-destructive behaviors that results in risk of death or serious injury to the residents of the City, including, but not limited to, Plaintiff and others similarly situated.

**Donnelly's Actions Leading Up to the Attack**

113.    On June 10, the day preceding the assault and battery of Plaintiff, Defendant Donnelly received the Police Combat Cross, the NYPD's second highest honor, in an annual

NYPD medal day ceremony wherein Defendant Donnelly was personally congratulated by then Police Commissioner William Bratton and Mayor Bill De Blasio.

114.    Following the ceremony, Defendant Donnelly returned to the 46th precinct. He changed into street clothes and worked on a few pending matters.

115.    That evening, he left the precinct with Defendants Bohr and Levesque and went to the Throggs Neck Clipper where they consumed a number of alcoholic beverages.

116.    Defendants Donnelly, Bohr and Levesque then went to Rory Dolan's, a popular drinking establishment among police officers.

117.    There, they met with Defendants Ryerson, McGee, Curly and Bracconeri and continued to consume alcoholic beverages, including, but not limited to beers, mixed drinks, and shots of jaeger and fireball.

118.    Defendants Donnelly, Ryerson, McGee and Curly then went to Rambling House where they continued to consume alcoholic beverages, including but not limited to, beers and tequila shots.

119.    Defendants Donnelly and Ryerson then returned to Defendant Ryerson's apartment at approximately 3:30 a.m. the morning of June 11, 2014. Defendant Ryerson at that time, resided at 549 East 234 Street, Bronx, N.Y; the same building as Plaintiff.

120.    Both men were intoxicated.

121.    Defendant Donnelly ate some food and then went to sleep, setting his alarm for work later that day, which included a Grand Jury proceeding.

**The Attack upon Plaintiff**

122.    The incident complained of herein and giving rise to said claim began on June 11, 2014. Plaintiff, at that time, resided at 549 East 234 Street, Apt. 4J, Bronx, N.Y.

123.    At approximately 5:30 a.m., Plaintiff was awakened by a loud banging noise. The loud noise was made by Defendant Donnelly making forcible entry into Plaintiff's apartment.

124.    Plaintiff screamed at Defendant Donnelly and told him to get out of her apartment.

125.    Defendant Donnelly attempted to communicate to Plaintiff that he was not a criminal by stating in police parlance, "I am not a bad guy."

126.    When Plaintiff continued to scream, Defendant Donnelly approached Plaintiff in her bedroom, grabbed her, and threw her to the ground.

127.    Defendant Donnelly straddled Plaintiff and proceeded to strike her about the head approximately 20-30 times.

128.    Despite her repeated pleas and screams, Defendant Donnelly continued to inflict verbal abuse and excessive force upon Plaintiff.

129.    During his attack on Plaintiff, Defendant Donnelly screamed, "Shut up, you ACS bitch. I know you have kids here. I know there are guns here. I know you have kids you ACS bitch."

130.    The attack upon Plaintiff mirrored an arrest Defendant Donnelly conducted on the Friday before the incident. In a pursuit to recover a firearm, Defendant Donnelly broke down a door, secured with a chain lock, where he noticed the suspect inside his apartment with young children. Defendant Donnelly demanded that the suspect turn over the gun, indicating to him that he did not want to have to contact the City agency ACS.

131.    When Defendant Donnelly turned away to search through Plaintiff's dresser, she was able to escape from his assault and fled her apartment. She ran down the hallway and tried to gain entry to other apartments and sought help by knocking on her neighbors' doors. No one

came to her aid.

132.     Fearing that Defendant Donnelly (who was still in Plaintiff's apartment) would resume his restraint and assault of her, Plaintiff fled down the stairs. Upon reaching the ground floor, she saw Defendant Donnelly exit her building.

133.     Defendant Donnelly ran outside looking for Plaintiff thinking she might be an escaped prisoner or someone who required assistance.

134.     Defendant Donnelly, after running outside of the building, attempted to gain re-entry to the building. After repeatedly hitting buttons on the intercom, a tactic he had used as a police officer, he finally regained entrance into the building.

135.     Defendant Donnelly then pounded on Defendant Ryerson's door until Defendant Ryerson's then girlfriend let him in.

136.     Defendant Donnelly then went back to sleep in Defendant Ryerson's apartment.

137.     Plaintiff, who resided within the 46th precinct, contacted the police. At least two other individuals in the area contacted the police to report a woman and a man fighting and the woman repeatedly screaming for help.

138.     The police officers arrived and canvassed the apartment for witnesses and potential suspects.

139.     A wanted poster was prepared and posted within the confines of the 47th precinct.

140.     On information or belief, the individual Defendants knew or should have known from the posting of the wanted posters, that Defendant Donnelly was a suspect in the crimes committed against Plaintiff.

141.     Despite that knowledge, none of the individual Defendants reported that Defendant Donnelly was the suspect on the poster, including Defendant Donnelly himself.

142.    On June 14, 2014, Defendant Donnelly met with representatives from Internal Affairs who placed him on modified duty, seized his firearms and shield, and told him "everything is going to be OK, there is counseling for this."

143.    Later that evening Defendant Donnelly's supervisor, Defendant Bohr, contacted Defendant Donnelly and told him to meet him at a local rest stop.

144.    Defendant Bohr showed Defendant Donnelly an image on his phone of the wanted poster with Defendant Donnelly's face on it.

145.    Furthermore, on information and belief, Defendant Ryerson, failed to report Defendant Donnelly, although numerous police officers had been in his apartment building conducting canvasses.

146.    During the incident herein described, Defendant Ryerson ignored Plaintiff's efforts to gain assistance from her neighbors.

147.    Moreover, Defendant Ryerson did not advise the police officers, who were searching Plaintiff's apartment building and the immediate vicinity thereof, that Defendant Donnelly was the suspect they were seeking to arrest.

148.    Subsequently, Defendant Donnelly completed in patient treatment at an alcohol abuse facility and a rehabilitative facility for treatment of PTSD related issues.

149.    Defendant Donnelly was later arrested on August 4, 2014, and initially charged with two counts of Burglary in the 2nd Degree, on count of Burglary in the 3rd Degree, two counts of Assault in the 3rd Degree, one count of Criminal Trespass in the 2nd Degree, one count of Trespass, and one count of Harassment in the 2nd Degree.

150.    On September 29, 2014, Defendant Donnelly was indicted on two charges of Assault in the 3rd Degree, two counts of Criminal Trespass in the 2nd Degree, and one count of

Criminal Mischief in the 4th Degree,

151.    On May 22 2016, Defendant Donnelly was arrested and charged with driving while intoxicated after he crashed his vehicle into several parked cars in the Upper West Side.

152.    On March 26, 2017, Defendant Donnelly pled guilty to misdemeanor assault, and on June 1, 2017, he was sentenced to three years probation.

153.    A Notice of Claim pursuant to New York General Municipal Law § 50-e was timely served upon Defendant City on September 5, 2014. More than thirty days have elapsed without the matter being resolved by the City. The Notice of Claim provided detailed information regarding the actions of the City and police personnel involved in the incident underlying the instant action and was sufficient to put the police personnel and the City on notice of the conduct that they are alleged to have engaged in.

## FEDERAL CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*(42 U.S.C. Section 1983 for Violations of the Fourth and Fourteenth Amendments)*

154.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Amended Complaint as if fully set forth herein.

155.    Defendant Donnelly, under color of law and with the indicia of authority of a New York City Police Officer, violated Plaintiff's constitutional rights to be free from the unreasonable and unnecessary use of excessive force and unreasonable searches and seizures.

156.    By engaging in the excessive consumption of alcohol, in the company of Defendant Donnelly, over an extended period of time, the Defendants Bohr, Levesque, Ryerson, Bracconeri, McGee, and Curly condoned, participated in, encouraged, and acquiesced in Defendant Donnelly's binge drinking, a proximate cause of his actions.

157.    As a result of their conduct, Defendants Bohr, Levesque, Ryerson, Bracconeri, McGee, and Curly Officers created or increased a serious danger that Defendant Donnelly could and would engage in drunken, violent behaviors, and acted with deliberate indifference to it.

158.    Accordingly, said Defendants exhibited a degree of reckless behavior and deliberately assumed or acquiesced in the risk that Defendant Donnelly, unless restrained, could or would engage in drunken, violent behaviors as alleged herein.

159.    Additionally, by engaging in the behaviors aforesaid, said Defendant Officers communicated to Defendant Donnelly that he would not be arrested, punished, or otherwise interfered with in the event that Defendant Donnelly engaged in the types of behaviors aforesaid.

160.    The excessive consumption of alcohol by officers of the 46th Precinct, the failure of supervisors to report such conduct, and the propensity for these officers to engage in anti-social and violent behaviors was known or should have been known to Defendant City and superiors within the NYPD hierarchy.

161.    Moreover, by engaging in such behaviors, and failing to report the same to their supervisors, or that Defendant Donnelly had become unfit for duty due to his PTSD and/or his excessive consumption of alcohol, said Defendant Officers increased the danger or condoned the risk that Defendant Donnelly would or could engage in acts of drunken violence as aforesaid.

162.    The failure of Defendant Ryerson, who allowed a drunken Defendant Donnelly to remain in his apartment without ensuring that Defendant Donnelly could not leave the apartment without proper supervision, increased the danger that Defendant Donnelly could or would engage in an act of violence within the apartment building and the floor wherein Plaintiff resided.

163.    By failing to take steps to restrain a drunken Defendant Donnelly while in

Plaintiff's apartment building, Defendant Ryerson condoned, acquiesced in or was deliberately indifferent to the risk that Defendant Donnelly would leave said apartment in a drunken state and engage in acts of drunken violence while in Plaintiff's apartment building and, in particular, in Plaintiff's apartment.

164.    As a result of the foregoing, Defendants Bohr, Levesque, Ryerson, Bracconeri, McGee, and Curly deprived Plaintiff of her substantive due process rights as secured by the Fourteenth Amendments.

165.    Additionally, said Defendant Officers, under color of law and with the indicia of authority of New York City Police Officers, violated Plaintiff's due process rights to be free from unreasonable seizure and excessive force, by encouraging and failing to intervene to prevent the actions of Defendant Donnelly knowing, that he was intoxicated and thereby unfit for duty.

166.    Each of the said Defendants' actions directly and proximately caused Plaintiff's injuries.

167.    In addition, the individual Defendants, by failing to report that Defendant Donnelly was the suspect named and pictured on the aforementioned wanted poster, engaged in a cover-up that was designed to shield these officers and Defendant Donnelly from discovering and proving a claim for the violation of constitutional rights.

168.    Additionally, the failures aforementioned were also designed to shield Defendant Donnelly from exposure to criminal liability for the assault on Plaintiff.

169.    These actions and/or inactions had the purpose and effect of denying Plaintiff meaningful access to the courts to redress her grievances in violation of the Due Process Clause of the Fourteenth Amendment.

170.     By these acts, omissions and conduct, Defendants Bohr, Levesque, Ryerson, Bracconeri, McGee, and Curly have deprived the Plaintiff of rights secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983.

171.     By the actions, omissions and conduct set forth above, Defendant Donnelly violated Plaintiff's constitutional rights to be free from the unreasonable and unnecessary use of excessive force and unreasonable searches and seizures as secured by the Fourth and Fourteenth Amendments in violation of 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF

*(Monell Claims For Municipal Liability Against Defendant New York City)*

172.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Amended Complaint as if fully set forth herein.

173.     Defendant City is responsible for the NYPD's policy, practice, and custom of being deliberately indifferent to alcohol abuse by on-duty and off-duty police officers.

174.     Defendant City knew of the longstanding problem of alcohol and substance abuse and its causative relationship to on-duty and off-duty violent acts by police officers. In fact, Comm. Bratton acknowledged this problem while serving as NYPD Commissioner from 1994-1996.

175.     Said Defendant knew or should have known that the failure to adequately address alcohol and substance abuse within the department had caused problems in the past, and would continue to cause problems in the future, including violations of constitutional rights, because of the failure to adopt and implement adequate policies, procedures and practices and to adequately screen, train, monitor, supervise and/or discipline police officers engaging in, or likely to engage

28

in, such behavior.

176.    Furthermore, Defendant City, as a matter of policy and practice, has with deliberate indifference, failed to properly investigate the background, beliefs and attitudes of prospective police officers in order to ensure it hires only police officers that respect and honor the constitutional rights of individuals, thereby causing the NYPD, including its Defendants in this case, to engage in the unlawful conduct described above.

177.    Defendant City, through its inaction, fueled a municipal policy of condoning such behavior in the 46th precinct and of creating an environment where police officers in that precinct believed that they could drink and act with impunity and they would be protected from all legal sanction when they engaged in such illegal activities.

178.    Despite the Defendant City's knowledge of Defendant Donnelly's long history of alcohol abuse and disorderly conduct, said Defendant failed to evaluate, supervise or monitor whether his work in the stressful occupation as a police officer would or did result in recidivistic alcohol abuse and violent behavior.

179.    Additionally, Defendant City knew or should have known of the detrimental effects a traumatic incident can have on its employees, and the timeframe for which symptoms can emerge, and how a lack of treatment had caused problems in the past, and would continue to cause problems in the future, including violations of constitutional rights because of the failure to adopt and implement adequate policies, procedures and practices and to adequately screen, train, monitor, and/or supervise police officers who have been involved in traumatic experiences.

180.    Said Defendant, as a matter of policy and practice, has with deliberate indifference, failed to properly implement mandatory and meaningful trauma-related assessments, screenings, services, and/or treatment for its employees who have been involved in

traumatic experiences.

181.    Defendant City, through its inaction, fueled a municipal stigma surrounding mental health and psychiatric services, and its employees' belief to avoid seeking such services as it is believed to have negative consequences on their reputation and career.

182.    Defendant City has failed to train its police officers on stress management, PTSD, and/or adopt an adequate early warning system that would signal when an officer was mentally unfit for duty.

183.    Defendant City has also failed to train its police officers on how to identify warning signs that fellow officers may be experiencing mental health problems.

184.    Said Defendant, through its purposeful omission, has also failed to require their police officers to report fellow officers who they may suspect and/or know are suffering from psychological issues, including, but not limited to, PTSD and alcohol abuse.

185.    Despite said Defendant's knowledge of Defendant Donnelly's involvement in a traumatic incident in May 2012, Defendant City failed to provide Defendant Donnelly with any meaningful trauma-related assessments, services, and/or treatment.

186.    By failing to properly assess Defendant Donnelly for evidence of PTSD and related behaviors after the shooting incident aforementioned, by failing to provide Defendant Donnelly with psychiatric services during his desk duty period, and/or by failing to assess Defendant Donnelly regarding PTSD and the potential for alcohol abuse prior to returning him to street duty, the Defendant City was deliberately indifferent to the risk that Defendant Donnelly would engage in abusive behaviors as a result of the trauma he experienced and the effects it had on his mental state.

187.    As a result of the foregoing failures of policies or practices of deliberate

indifference, the City failed to supervise Defendant Donnelly. Said failures were the proximate cause of Plaintiff's injuries.

188.    This deliberate indifference on the part of the Defendant City directly and proximately caused the deprivation of Plaintiff's constitutional rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

## THIRD CLAIM FOR RELIEF

*(Supervisory Liability)*

189.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Amended Complaint as if fully set forth herein.

190.    Defendant Bohr, at all relevant times was Defendant Donnelly's supervisor, and a supervisor of one or more of the other Defendant officers, directly and personally participated in acts that were the proximate cause of Plaintiff's injuries.

191.    Defendant Bohr knowingly, and with a grossly negligent derogation of his duty, encouraged and facilitated Defendant Donnelly and the other Defendant officers to drink excessively.

192.    Defendant Bohr knowingly, and with a grossly negligent derogation of his duties, encouraged and facilitated Defendant Donnelly, while under stress of his heavy workload and with inadequate sleep, to consume alcohol, and through his actions and inactions communicated that Defendant Donnelly could violate the law and NYPD policies without consequence.

193.    As a direct and proximate cause of Defendant Bohr's failure to supervise his subordinates, Plaintiff's constitutional rights were violated as aforementioned in violation of 42 U.S.C. § 1983.

194.    In light of the foregoing, Defendant Bohr had knowledge that his actions and/or

inactions created a risk of harm, and that his failure to report Defendant Donnelly to the appropriate authorities, before he assaulted Plaintiff, would have addressed adequately the risk of harm created by Defendant Bohr's failures aforementioned.

195.     As a direct and proximate cause of the aforementioned actions and/or inactions of said Defendant, Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments were violated by said Defendant.

## STATE LAW CLAIMS FOR RELIEF

## FOURTH CLAIM FOR RELIEF

*(Respondeat Superior Liability against Defendant New York City)*

196.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Amended Complaint as if fully set forth herein.

197.     At all times pertinent hereto, Defendants Donnelly, Bohr, Levesque, Ryerson, Bracconeri, McGee and Curly were acting within the scope of their employment as officers of the NYPD.

198.     Defendant City, through its agents, expressly or implicitly authorized the individual Defendants to violate Plaintiff's constitutional rights, as described above.

199.     Defendant City is thus liable under the doctrine of respondeat superior, for the intentional and/or negligent torts of Defendants herein which were committed within the scope of their employment.

## FIFTH CLAIM FOR RELIEF

*(Negligence)*

200.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Amended Complaint as if fully set forth herein.

201.    The Defendants Donnelly, Bohr, Levesque, Ryerson, Bracconeri, McGee and Curly, while acting as employees for Defendant New York City, owed a duty to Plaintiff to perform their duties without violating Plaintiff's constitutional rights.

202.    The individual Defendant Officers abused alcohol and violated their 24 hours a day duty to enforce and adhere to the laws of the State of New York. These violations were proximate causes of the unlawful and unnecessary use of force against Plaintiff and constitute negligence for which these Defendants are liable.

203.    Said individual Defendants violated the requirements of the NYPD Patrol Guide and regulations thereunder that require that officers do not render themselves unfit for duty.

204.    Said individual Defendants further violated the requirements of the NYPD Patrol Guide and regulations thereunder that require that officers report instances where fellow officers have rendered themselves unfit for duty.

## SIXTH CLAIM FOR RELIEF

### (*For Assault and Battery Against Defendant Donnelly)*

205.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Amended Complaint as if fully set forth herein.

206.    The actions of Defendant Donnelly were intentional, malicious, and were committed with wanton disregard and with depraved indifference for the Plaintiff's rights.

207.    The actions of said Defendant constituted unwarranted, unreasonable, unnecessary, and excessive use of force against Plaintiff.

208.    The actions of said Defendant caused Plaintiff to suffer fear and apprehension of physical harm.

209.    The actions aforesaid of said Defendant caused Plaintiff to suffer physical and

33

psychological injuries.

210.    The actions aforesaid constituted unlawful assaults and batteries upon Plaintiff.

211.    As a result of the conduct alleged herein by said Defendants, Plaintiff suffered and continues to suffer, physical, psychological, emotional and economic injuries.

## **PUNITIVE DAMAGES**

212.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Amended Complaint as if fully set forth herein.

213.    The acts of the individual Defendants were willful, wanton, malicious, and oppressive. These acts were without any justification and caused Plaintiff severe and ongoing suffering. Such acts therefore warrant an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.    Compensatory damages in an amount of 12 Million Dollars;

b.    Punitive damages in an amount to be determined at trial;

c.    An award of the costs and expenses of this action including attorneys' fees to the Plaintiff pursuant to 43 U.S.C. § 1988; and

d.    Any such other and further relief as this Court may deem appropriate.

## A JURY TRIAL IS DEMANDED

DATED:    New York, New York
               July 20, 2017

                             NEWMAN FERRARA LLP

By: _____
            Randolph M. McLaughlin
            rmclaughlin@nfllp.com
            Debra S. Cohen
            dcohen@nfllp.com
            Danielle B. Sullivan
            dsullivan@nfllp.com
            1250 Broadway, 27th Floor
            New York, New York 10001
            Tel: 212-619-5400
            Fax: 212-619-3090

            *Counsel for Plaintiff*